**FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Appellant,**

v.

**Jack F. BROWDER, Appellee.**

No. 18683.

United States Court of Appeals
Fifth Circuit.

May 17, 1961.

Rehearing Denied July 7, 1961.

Hilton H. Howell, Wilford W. Naman, of Naman, Howell, Smith & Chase, Waco, Tex., for appellant.

John F. Sheehy, J. Robert Sheehy, of Richey, Sheehy, Teeling & Cureton, Waco, Tex., for appellee.

Before TUTTLE, Chief Judge, and HUTCHESON and JONES, Circuit Judges.

TUTTLE, Chief Judge.

This is an appeal from an order of the district court affirming an order of the Referee in Bankruptcy granting a discharge by Jack F. Browder. The bankruptcy proceedings involved both Browder personally and Browder Construction Company, of which Browder was an equal partner with one Jones.

The principal basis of appellant's objection to the discharge in bankruptcy is that Browder individually had violated 11 U.S.C.A. § 32, sub. c(3) [1] in that he

---

1. "The court shall grant the discharge unless satisfied that the bankrupt has * * * (3) obtained money or property on credit or obtained an extension or renewal of credit, by making or publishing or causing to be made or published in any

filed false financial statements with appellant for the purpose of obtaining bid and contract bonds in connection with construction contracts in which his company was engaged.

In the hearing before the Referee numerous statements submitted by Browder to appellant were introduced in evidence as were numerous audit reports prepared by the partnership for its own purposes. Gross inconsistencies are apparent as between the company's own audit reports and the statements furnished by it to the bonding company.

■ The Referee narrowed the issue, so far as relates to the ground set out above, to a determination whether the statements furnished to the appellant purporting to show the financial condition of Browder and the partnership as of May 31, 1953, and as of November 30, 1953, were "materially false" within the meaning of the Bankruptcy Act. In deciding this issue the Referee considered that in order to deny the bankrupt a discharge it must be found that at least one of the statements was not only false in a material degree but was known to be false by the bankrupt or made by him with such recklessness or abandon as to impute knowledge to him. This we consider to be the proper test. See Morimura Arai & Co. v. Taback et al., 279 U. S. 24, 49 S.Ct. 212, 73 L.Ed. 586.

The Referee directed his inquiry almost exclusively to the liabilities side of each of the statements. This followed from the fact that the only true comparison could be made on the liability side because on the asset side assets of Browder individually were included in the statements furnished to appellant, whereas only the partnership's assets were included in the audit reports, and thus no true comparison could be made directly from the one to the other.

It is not disputed that the statement submitted to appellant for May 31, 1953, showed an understatement of liabilities shown on the partnership audit. The

Referee did not consider that this discrepancy was such as should deny appellee the right to a discharge because of the fact that a very substantial part of it, $79,033.26, represented promissory notes that were in effect offset by anticipated benefits to be received from a construction contract. In effect the Referee found that this was a technical omission which did not affect the net worth of the partnership, although, as strenuously argued by appellant, and as supported by evidence, it did, of course, have a material effect on the ratio of current assets to current liabilities.

In addition to this substantial item, there were four other items of liabilities that were clearly shown on the company's audit report but which were omitted from the liability column in the statement furnished the bonding company. These items were as follows:

| $ 2,566.86 | Notes to Farmers State Bank, Groesbeck |
| 11,268.18 | Accounts payable to subcontractors for retainages |
| 5,599.36 | Employment taxes payable |
| 1,638.99 | Accrued expense. |

$21,073.39

The Referee dismissed these as "minor items of no material importance." Unless this method of treatment is legally acceptable it is almost impossible to believe that they were not knowingly omitted from the financial statement. This, because there was an appropriate blank space on the financial statement expressly calling for the information touching on these items and the bankrupt had before him at the time he made out the statement the audit report which clearly depicted these same items. Thus, in the audit report on page 1, the summary sheet, there are listed the following items:

"Accounts Payable
  Retainage, Exhibit 'A-4' .   11,268.18
Notes Payable, Exhibit 'A-5'  102,661.17

manner whatsoever, a materially false statement in writing respecting his financial condition." 11 U.S.C.A. § 32, sub. c(3).

Tax payable, Employment . 5,599.36
Expense, Accrued, Interest
  and Insurance . . . . . . . . . .  1,638.99"

Similarly on the statement submitted to appellant the following items appear:

"Notes Payable (As per
  Schedule 'I') . . . . . . . . . . .  20,000.00
  (a) To Banks Regular . . . . . . . . . . .
  (b) To Banks for Certi-
      fied Checks . . . . . . . . . . . . . . . .
  (c) To Material Furnishers . . . . . . . . .
  (d) To Others (Exclu-
      sive of Equipment).. . . . . . . . .
Owing Sub-Contractors Ac-
  count of Retained percen-
  tage and Earned Esti-
  mates (as per Schedule 'I') . . . . . . . . .
      *    *    *    *    *    *
Income Taxes . . . . . . . . . . . . . .  . . . . . . . .
  (a) Unpaid balance under
      filed Returns . . . . . . . .  . . . . . . . .
  (b) Reserve or Estimated
      Amount Payable on
      Profit for Period Im-
      mediately Preceding . . . . . . . . . .
Miscellaneous Taxes and
  Other Accruals . . . . . . . .  . . . . . . . ."

Thus, it is apparent that in addition to the $79,033.26 of notes above discussed, appellee omitted $2,566.86 shown on his audit report as payable to Farmers State Bank, Groesbeck. He also left out $11,268.18, which was shown on his audit report as due subcontractors or material-men as "retainages" (this represents the proportionate part of amounts estimated to be due the partnership but retained by the owners until completion, which was due to sub-contractors or materialmen. He also omitted $5,599.36, which his audit report showed was due for employment taxes, although this item was called for under the statement form which he furnished to the appellant under the item, "Miscellaneous Taxes and Other Accruals." So, too, was the item, "Expense, Accrued, Interest and Insurance" of $1,638.99, which was shown on his partnership audit but omitted from the statement furnished the Company.

Upon the conclusion of the hearing on July 19, 1958, the Referee, on August 6th, without waiting for a transcript of the proceedings, entered a memorandum opinion granting the bankrupt his discharge. He thereupon called upon the bankrupt's attorneys to prepare findings of fact and conclusions of law consistent with such memorandum opinion. In his opinion the Referee disposed of the discrepancy of the four items totalling over $21,000 in the 1953 report by mentioning it only in his discussion of the failure to include $79,033.26 in promissory notes owed by Browder Construction Company to the Fort Worth National Bank. This reference was in the following language:

"Aside from minor items of no material importance [these are the four items referred to] the main difference between this financial statement and the auditor's report is that the former did not include and the latter did include $80,000 in notes payable * * *"

In the formal findings of fact subsequently signed by the Referee the $21,000 discrepancy is not mentioned at all. The only item dealt with in the formal findings of fact as to the May 31 financial statement is the omission of the $79,033.-26 (discussed as $80,000 in the Referee's findings). We do not think that the failure of the bankrupt to make a satisfactory explanation as to his omission of some $21,000 of liabilities from a total then owing of $101,000 can be so blandly overlooked when strongly urged by an opposing creditor as evidence of the filing of a materially false statement for the purpose of obtaining a contract bond. This is particularly so in light of the fact that glaring omissions likewise occurred in the financial statement submitted for the period ending November 30, 1953, which we will next touch upon.

Coming now to the November 30th statement, which appellant insisted was materially false and filed with knowledge of its falsity or without the required legal standard of knowledge of its truth or falsity, we quote the language of the Referee as contained in his memorandum opinion:

"The financial statement as of November 30, 1953, presents a more difficult problem. Mr. Browder showed that accounts payable (round figures) were $51,000.00; the C.P. A., Mr. Nelson, reported and testified that as of November 30, 1953, the accounts payable of the Browder Construction Company (round figures) were $113,000.00, approximately $62,000 more than the Browder financial statement figure. Mr. Browder's financial statement was prepared about a month after November 30, 1953; the audit was started on April 19, 1954, and completed the latter part of May, 1954. In his audit Mr. Nelson included as accounts payable all invoices and bills dated up to and including December 1, 1953. There was no direct evidence as to when these invoices and bills were received by Mr. Browder or by his office at Groesbeck. All bills for labor, materials, etc., for the construction jobs were supposed to be approved by Earle Jones (the partner in the field) and to be forwarded by him to the Groesbeck office. Browder testified that he included in the November 30, 1953, financial statement the total figures of all accounts payable known to him to be then owing, or for which he had received bills or invoices; that he had no way of knowing what work was being done or what might be owing to any materialmen, laborers, or subcontractors until he received a bill or invoice approved by Jones; that he knew that Jones often was not prompt in approving and mailing the invoices to him. This in substance was his explanation of why his financial statement as of November 30, 1953, showed accounts payable considerably less than one half the amount the auditor testified was actually owing at that time.

"It is indisputable that the financial statement was both very incorrect and materially incorrect; that it was submitted for the purpose of obtaining credit from and was relied upon by the objecting creditor in extending its credit. Assuming that the bankrupt, acting in good faith, believed the statement to be true, was the statement in the language of the statute, *'materially false'*? It has been frequently said as counsel for the bankrupt argues:

" * * * that an intent to defraud is essential; the word 'false' means more than erroneous or untrue and imports an intention to deceive and a materially false statement in writing must have been knowingly or intentionally untrue to bar a discharge.

But it has also been stated in a number of cases that where there are gross misstatements which would clearly have weight with anyone appraising the advisability of extending credit, discharge should be denied. It has also been held that while falsity in fact is essential, actual knowledge of the true facts or conscious intent to deceive is not necessary, where the bankrupt has made no effort to verify the facts stated, and had no reasonable ground to believe that the facts were correct. The bankrupt of course must be presumed to intend the natural and probable consequences of his acts. That he intended to get credit from the objecting creditor when he gave it the financial statement and that he got credit because of the statement is beyond doubt. Does it necessarily follow that he intended to deceive the credit grantor? Somewhat differently expressed, was the financial statement as of November 30, 1953, made by Browder so recklessly and negligently as to warrant a finding that he acted fraudulently? It is difficult for me not to believe that Browder might well have suspected that his partnerships accounts payable were a great deal more than $51,000.00 on November 30, 1953. There was some

evidence that he did make occasional visits to the larger jobs. There was at least some reason for him to be more diligent than he apparently was in requiring statements from his partner on the status of the pending contracts. However, considering all of the evidence, and particularly because of the increasingly liberal tendency of the Courts in weighing bankrupts' rights to discharge, I am inclined to give the bankrupt the benefit of the doubt; and so I shall find that the statement was not intentionally false, was not made with actual knowledge of its falsity, and that it was not so recklessly made, without regard to its truth, as to have been motivated by a desire to deceive or mislead the objecting creditor."

Again it will be observed that in dealing with the very great discrepancy between the liabilities shown on the November 30th statement (the statement showed current liabilities of $55,456.33, whereas the audit report showed current liabilities of $127,636.50, an apparent total understatement of current liabilities of $75,829.67, or nearly 150% of the amount shown), the Referee discussed only the item of trade accounts payable. He made no mention of an item of $22,-586.78 of accounts payable to subcontractors for retainages, $3,081.12 promissory notes of the company, $4,609.07 employment taxes, $4,387.90 accrued expenses, or $2,000 of accounts payable of the Browder Lumber Company (these were includable because the statement purported to include assets and liabilities of this wholly owned business of the appellee.).

One substantial difference distinguishes the situation as to the November 30th financial statement from that of May 31st. Browder did not have his company's audit report before him at the end of December or the first of January when he prepared the November statement now under discussion. Therefore, the Referee might well infer that Browder's failure to include an item of em-

ployment taxes or accrued expenses which would not appear on the books of the partnership were omitted without fault, because they were not present in Browder's mind, notwithstanding the fact that each audit report theretofore made for the company did include such items on the liability side of the report.

This, then, leaves, in addition to the other two small items above mentioned, an understatement of more than one half of the accounts payable then owed by the company, a sum in excess of $30,000, and it leaves an understatement of $22,-586.70 of accounts payable to subcontractors for retainages.

Dealing first with the latter item, because it has not been touched on by the Referee in his findings, not even by characterizing it as "minor" or "of no material importance," we find that on the audit report there was a separate liability item shown, just as there had been on the May 31st report already described, denominated, "Accounts Payable, Retainage—$22,586.78." We also find that on the financial statement submitted to the appellant for November 30th there was a space denominated, "Owing Subcontractors account of Retained Percentages and Earned Estimates (as per Schedule J)." The space was blank on the face of the report, but reference to Schedule J shows this entry, "Included in accounts payable." The accounts payable item shown on this statement was $51,856.83. It was not itemized.

The audit report showed a trade accounts payable figure of $91,263.00 *in addition* to the retainage of $22,586.78. Thus, the financial statement submitted to appellant contained either an understatement of $61,751.58 of the two items combined—if the retainages were included in the $51,856.83—or an understatement of $39,164.80 in accounts payable and a complete omission of the retainage item.

The Referee treated the difference as one made up entirely of a failure to report the full amount of trade accounts payable. In so treating it the Referee concluded that Browder had satisfac-

torily explained the disparity between $51,000 of accounts payable, reported by him, and $113,000 actually owed,[2] whereas a correct comparison would have been between $29,270.05 of trade accounts payable reported by him and $91,021.63, which were actually owed on that date. This inaccurate treatment of the facts by the Referee [3] makes it impossible for us to know whether the Referee would as readily have accepted as meeting the burden of proof cast on Browder to explain the discrepancy [4] when he reported only 33.3% of the accounts payable as he did when he thought the bankrupt had disclosed 45 plus per cent of the accounts due.

Of course, if the Referee's finding that the accounts payable figure as shown in the financial statement represented only trade accounts, as he did, notwithstanding the statement in the Schedule J that this item included retainages, then the Referee has made no finding touching on the failure of the Bankrupt to report the $22,586.78 item of retainages. Since this item arises automatically under the contracts being performed by the partnership, in that it represents the 10% of the architect's estimates of work completed and is reflected as accounts receivable on the asset side of the ledger, it is difficult to understand how the figure could be left out in any good faith attempt to depict the company's true financial position.

Moreover, the record touching upon the omission of the very large amount of accounts payable from the financial statement for November 30th falls short of substantial evidence to support the Referee's finding that this statement "was not intentionally false, was not made with actual knowledge of its falsity, and that it was not so recklessly made, without regard to its truth, as to have been motivated by a desire to deceive or mislead the objecting creditor."

As shown by the Referee's opinion, this statement was not prepared until some thirty days following November 30th, the date as of which it purported to present a true picture. Furthermore, as stated by the Referee, Browder "knew that Jones often was not prompt in approving or mailing invoices to him." This same proposition is stated in Browder's brief in the following language:

> "It was the procedure for handling accounts of Browder Construction Company that they first went to the partner Jones, who was the construction man and who was familiar with the work that had been done. Jones then approved these accounts, and forwarded them in to the office at Groesbeck to Browder."

Dealing with this practice, the Referee said:

> "There was at least some reason for him to be more diligent than he apparently was in requiring statements from his partner on the status of the pending contracts."

■ Under the requirements that a person purporting to make a true financial statement for the purpose of obtaining money or credit cannot represent as true that which he does not have adequate reason to believe is true, we would say this statement should be: "There was at least *every* reason for him to be more diligent," at least to the extent of inquiring from Jones some time within the thirty days period whether there were bills payable in Jones's possession that were not before Browder for inclusion in the financial statement. It was clearly erroneous for the Referee

2. This is the explanation discussed by the Referee in the statement quoted above, that is that a large amount of the accounts payable were not reported because the bills were held by Browder's partner.

3. As we have noted above, the Referee entered an order without having the transcript of the evidence before him.

4. The Referee announced that burden of proof had shifted to the bankrupt to explain the discrepancy as to these two financial statements. This is in accord with the legal precedents. See, Margolin v. Moskowitz, 2 Cir., 157 F.2d 872, and see 11 U.S.C.A. § 32, sub. c(7), which expressly so provides.

to find, as he did, that there was no positive duty on Browder to do more under the circumstances than to report as accounts payable only those items which had been received by him, knowing as he did that Jones sometimes delayed in the forwarding of outstanding invoices.

■ What we have thus said indicates that as to neither of the financial statements discussed do the findings of the Referee afford an adequate basis for affirming the conclusions reached in the granting of the discharge. In addition to what has already been said, it is noted that all of the testimony of Browder as to the reason for not including any of the undisclosed accounts payable was in purely general terms—that is, that he included all accounts of which he had actual knowledge and as to which he had approved bills in his office. No effort at all was made to prove, either by Jones or otherwise, how many bills, later determined actually to be due on November 30th, had actually not been transmitted to Browder or the office prior to his making up of the financial statement. The books of account were not in evidence and Jones's testimony was not produced. The burden cast on Browder by the gross discrepancies could be discharged, if at all, we think, only by his making a more factual showing as to the particular items, or at least a substantial number of them.

■ The District Judge affirmed the order of the Referee on the basis that it found substantial evidence to support the findings which we have heretofore referred to. What we have said indicates that we disagree with this conclusion of the District Court. We conclude, therefore, that the order granting the discharge and the trial court's judgment affirming it must be reversed.

In a reconsideration of the matter by the Referee, we indicate that the matter touching on the second specification, that is the failure to account for substantial assets should also be re-examined in light of the following observations: The Referee seemed to consider that the object-ing creditor was placed in a dilemma because it was attacking the correctness of the financial statements and was at the same time claiming that assets reported on the financial statements were not sufficiently accounted for. The appellant, correctly we think, points out that this is a dilemma for the Bankrupt and not for the opposing creditor. This principle, we think, is adequately stated in Remington:

"Frequently a bankrupt is confronted with the dilemma of a financial statement made prior to the bankruptcy showing substantial net worth, and his schedules in bankruptcy, or the appraisal in bankruptcy, showing a deficit. Under such circumstances, the bankrupt must account for the disappearance of his assets, or to be found guilty of either making a false financial statement or concealing assets." 7 Remington, Sec. 3221.

■ Bearing in mind that the burden is not upon the objecting creditor to prove which of the grounds it relies on to show the bankrupt not entitled to a discharge, but it is rather a burden for the bankrupt either to rely upon his financial statements and account for the assets claimed in them, or explain satisfactorily the reason for their inaccuracies and thus reduce the amount of assets as to which he is expected to make a reasonable showing, the Referee should consider, on remand, whether the record before him, or as supplemented by additional testimony, meets the requirement of Section 32, sub. c(7), requiring a satisfactory explanation of any loss or deficiency of assets.

The judgment is reversed and the case remanded for further proceedings not inconsistent with this opinion.

HUTCHESON, Circuit Judge (dissenting).

I cannot agree with the opinion of the majority which, holding that the bankrupt should have been denied his discharge, reverses the findings and order

of the referee and district judge, that he was entitled to a discharge.

With deference, it seems clear to me that the opinion completely overlooks the fact that the referee heard the testimony of the bankrupt and was in the best position of anybody to determine whether the necessary ingredient of fraud and intent was present and accompanied the making of the statements.

As everyone knows, bankruptcy is an act of grace, having for its purpose and object the highly remedial one of doing away with the burdens and disabilities which in the olden days, before its passage, followed a man's heavy involvement in debt, sometimes sent him to debtor's prison, and, even after imprisonment for debt was abolished, broke and destroyed the lives of persons whose chief fault was that they had dared to take a chance in the business world. The statute authorizing discharge, 11 U.S.C.A. § 32, reads: "(a) *The adjudication of any person * * * shall operate as an application for a discharge: * * *"*, and in subsection c reads: "*The court shall grant the discharge unless satisfied that the bankrupt has*" *done one of the things set out in that section.* (Emphasis supplied.) These are (1) that he has "committed an offense punishable by imprisonment as provided under section 152 of Title 18;" or that he has done one of the specific criminal or fraudulent acts or things stated in the other subdivisions of that section.

Recognizing the remedial character of the discharge provisions, and that *the prime purpose of bankruptcy* is to secure a discharge and to start a new life for an unfortunate debtor, the courts have uniformly held that the definition of a materially false statement in writing respecting his financial condition as set out in subsection (3) of Section 32, sub. c, includes and requires criminal scienter, that is a willful purpose and intent to defraud and that especially where the bankrupt testifies and the trier has the opportunity to judge his credibility, the finding of fact of the referee that the bankrupt has not made a "materially false statement in writing respecting his financial condition", within the meaning of the statute, is entitled the greatest respect and consideration.

The referee in this case, a long time referee in the Western District of Texas, with great knowledge and experience in administering bankruptcy, has, as he points out in his opinion and findings of fact, deliberately found in the bankrupt's favor on this important fact, and the district judge, in refusing to set aside the referee's finding, specifically pointed out that the referee had the opportunity to determine the bankrupt's credibility in respect to this matter of criminal intent, and that he felt bound by the finding.

In these circumstances, it seems to me that, in reversing the referee's findings of fact on the basis of an analysis of the statement, the opinion of the majority tithes mint, anise and cumin, and overlooks the weightier matters of the law, when it undertakes, by a dry bones accounting analysis, to convict the defendant of intentional and willful fraud, contrary to his testimony believed and accredited by the referee.

Where, as here, a single creditor, a bonding company which knew that, in bonding a contractor who was as much spread out as this one was, it was entering a speculative and risky business, seeks to prevent the bankrupt from making a new and clean start, as between the findings of the referee, based as they were upon actual observation of the bankrupt and not merely an analysis of figures, and the dry as dust effort of the majority, by an analysis of figures, to determine the presence of criminal intent, I choose to take my stand with the opinion of the referee and the district judge, that the bankrupt did not deliberately intend to defraud so as to be justly subject to loss of the benefits of the statute, and to cast my vote for affirmance. I, therefore, respectfully dissent.