In re Bobby J. MILLER.

Lynn FOURNET, Jr., Plaintiff,

v.

Bobby J. MILLER, Defendant.

Bankruptcy No. 479–00097–LO.
Adv. No. 480–0010.

United States Bankruptcy Court,
W. D. Louisiana,
Lafayette-Opelousas Division.

Aug. 7, 1980.

John H. Pucheu and Jacque B. Pucheu, Jr., Eunice, La., for plaintiff, Lynn Fournet, Jr.

Kenneth Pitre, Eunice, La., for debtor, Bobby J. Miller.

## OPINION

RODNEY BERNARD, Jr., Bankruptcy Judge.

This cause came on for trial on April 8, 1980, at Opelousas, Louisiana, upon a complaint to determine the dischargeability of a debt.

Upon consideration of the pleadings, the evidence, and argument of counsel, the Court makes the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, it is adopted as such and to the extent that any conclusion of law constitutes a finding of fact, it is adopted as such.

## FINDINGS OF FACT

1.

During the early fall of 1978, plaintiff and debtor entered into an oral contract for the remodeling of plaintiff's home.

2.

The terms of the contract provided that the plaintiff would make payments to the debtor based on invoices submitted by the debtor, said invoices showing material supplied by G.J. Deville Lumber Company, Inc., and labor furnished.

3.

Work began in September, 1978, and the last delivery of materials by G.J. Deville Lumber Company, Inc., supplier, was made on November 20, 1978.

4.

G.J. Deville Lumber Company, Inc., supplied the materials for the job, paid Bobby Miller's time, and also that of his employees on the job. Bobby Miller then prepared an

invoice for the materials and labor, and submitted the invoices to Mr. Fournet.

5.

Bobby Miller submitted an invoice to Mr. Fournet dated September 7, 1978, listing various materials furnished totaling $12,388.77. Mr. Fournet gave Bobby Miller a check for this amount dated September 7, 1978. Mr. Miller admits that after he deposited this check in his banking account, he used it to pay debts on a previous job rather than for Mr. Fournet's materials.

6.

Mr. Miller submitted a second invoice to Mr. Fournet on October 5, 1978, describing materials furnished in the amount of $13,244.83. In response, Mr. Fournet gave Bobby Miller a check for this amount dated October 9, 1978. The evidence submitted in court showed that at least $10,771.18 of this check was used as payment on other jobs than Mr. Fournet's.

7.

The invoice dated October 5, 1978, included the amount of $12,520.73 owed to G.J. Deville Lumber Company, Inc., but Bobby Miller made no payment to the lumber company from the check paid by Mr. Fournet on October 9, 1978.

8.

Mr. Miller admitted that the reason he didn't pay G.J. Deville Lumber Company, Inc., out of Mr. Fournet's check was because he was using the money to pay for other jobs in addition to paying some of his personal expenses.

9.

Mr. Miller also admitted that when he took Mr. Fournet's check he knew he was going to spend it on things other than the G.J. Deville account, but he did not tell Mr. Fournet what he planned to do.

10.

From October 18, 1978, to January 10, 1979, Mr. Miller made no payment on any jobs at all.

11.

Bobby Miller submitted a third invoice to Mr. Fournet on November 13, 1978, for the total amount of $38,060.01, later found to be in error and corrected to $30,133.97.

12.

After receiving the third invoice, Mr. Fournet discovered that Mr. Miller had not paid anything to G.J. Deville Lumber Company, Inc., on Mr. Fournet's account. At that point, Mr. Fournet made a check for $30,000.00 payable to both Bobby Miller and the lumber company.

13.

Subsequent to December 15, 1978, the G.J. Deville Lumber Company, Inc., filed a lien against Mr. Fournet's home and filed a suit against him to enforce the materialmen's lien on account of a debt of $16,220.76 past due and owing.

14.

Mr. Miller admitted that although he itemized costs for the invoices, he did not intend to pay the itemized costs when he received the payment, but instead planned to use the payments to cover debts on other accounts without informing Mr. Fournet. Mr. Miller admitted that this was his usual mode of business operation.

15.

Mr. Miller intended to catch up on Mr. Fournet's bill as payments were made on later jobs, or to pay the debt from his personal funds hidden in a safe at his home. However, the cash in his safe, amounting to a sum in excess of $25,000.00, was allegedly stolen around the beginning of November, 1978. Mr. Miller admitted that although he had the money to pay Mr. Fournet's accounts prior to the robbery, he chose not to.

16.

Mr. Miller filed a voluntary petition in bankruptcy on December 12, 1979, seeking relief under Chapter 7.

## CONCLUSIONS OF LAW

Counsel for the plaintiff urge that the debt in question should not be discharged, citing as statutory authority subsections (a)(2)(A), (a)(4), and (a)(6) of Section 523 of the Bankruptcy Code. Since the Court finds the debt excepted from discharge under the provisions of Section 523(a)(2)(A), we do not reach the question of whether subsections (a)(4) and (a)(6) would apply in this circumstance.

Section 523(a)(2)(A) provides as follows:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, other than a statement respecting the debtor's or an insider's financial condition;

The frauds included in this subsection are those which, in fact, involve moral turpitude or intentional wrong. The representation must be knowingly and fraudulently made, and they must be relied upon by the other party. It is not necessary that the false pretense or representation be made in writing; a misrepresentation by a debtor of his intention may constitute a false representation within the exception to discharge. Similarly, the exception applies when the debtor is entrusted with money to be used for a specific purpose and has no intention of using it for that purpose. *Collier on Bankruptcy*, 15th ed., vol. 3, paragraph 523.08(4).

Since the Bankruptcy Code has been in effect for a period less than a year, there has, as yet, been little case law interpreting this subsection. However, former section 17a(2) has been incorporated into 11 U.S.C. § 523(a)(2)(A) with little substantive change; therefore the existing case law construing section 17a(2) is applicable to the resolution of the instant dischargeability question. *In re Jones*, 3 B.R. 410, 6 BCD 68 (Bkrtcy. W.D. Vir. 1980).

In the case of *In re Pischke*, 3 BCD 900 (D. Minn. 1977), the facts were similar to those in the instant case. The plaintiffs and the defendant had entered into an agreement whereby the defendant was to construct a duplex upon certain real estate owned by the plaintiffs. Pursuant to the agreement, the plaintiffs paid to the defendant on three separate occasions sums totaling $19,000.00 to be used toward construction of the duplex. Two of the payments were made in reliance upon the authenticity of four lien waivers which had been forged by the defendant and then presented to the plaintiffs. As a direct result of the defendant's actions, the plaintiffs were damaged due to litigation with the mechanics' lien claimants and payments made to complete the project in excess of the expected costs. The court held that the defendant's actions in presenting the forged lien waivers and accepting payments in return constituted obtaining money by false pretenses or false representations within the meaning of section 17a(2) of the Bankruptcy Act, and that therefore the debt was not discharged.

In another case, *In the Matter of McGrath*, 1 B.R. 691, 5 BCD 601 (Bkrtcy. S.D.N.Y. 1979), similar results were obtained. There the plaintiff attempted to buy a yacht through the bankrupt. The plaintiff paid in advance, relying on the bankrupt's promise to forward the money to the manufacturer immediately in order to begin production on the boat. But instead, the bankrupt immediately deposited the money in the tax escrow fund of the corporation of which he was president. The court found that the bankrupt had obtained the money from the plaintiff by false pretenses or false representations upon which the plaintiff relied to her damage. Therefore, the bankrupt was liable to the plaintiff for fraudulently inducing her to part with her money. The court held that such liability is not dischargeable within the meaning of

section 17a(2) of the Bankruptcy Act. The court further stated that where a person knowingly or recklessly makes a false representation which the person knows or should know will induce another to advance money, an intent to deceive may logically be inferred. Even though the bankrupt intended ultimately to attempt to complete the plaintiff's purchase and obtain a boat for her is immaterial, the point being that the plaintiff advanced the money for delivery to the boat manufacturer and not to be retained by the bankrupt's corporation in its tax escrow account.

The Ninth Circuit has adopted a five-part test for determining when a debt is nondischargeable under section 17a(2). The five discernable elements of proof to be borne by the objecting party are as follows:

(1) That the debtor made the representation;

(2) That at the time he knew they were false;

(3) That he made them with the intention and purpose of deceiving the creditor;

(4) That the creditor relied on such representations;

(5) That the creditor sustained the alleged loss and damage as the proximate result of the representation made.

*Sweet v. Ritter Finance Co.*, 263 F.Supp. 540, 543 (W.D. Va. 1967), quoted with approval in *In re Taylor*, 514 F.2d 1370, 1373 (9th Cir. 1975), and in *Matter of Nelson*, 561 F.2d 1342, 1346 (9th Cir. 1977), and adopted by the Ninth Circuit in *In re Houtman*, 568 F.2d 651 (9th Cir. 1978).

█ Although this test has not been adopted by our own circuit, it does provide a guideline for use in the instant case. We find that each element has been proved by the plaintiff. The terms of the contract between the parties provided that Mr. Fournet would make payments to Mr. Miller based on periodic invoices for labor and materials used in the construction of Mr. Fournet's home. As the work progressed, Mr. Miller presented invoices to Mr. Fournet, each one itemizing the amounts due to various suppliers of material. On present-

ing these invoices and receiving Mr. Fournet's corresponding checks for the stated amounts due, without informing Mr. Fournet that his payment would not be used to pay the itemized costs, the debtor made a false pretense or representation in order to obtain money to pay other creditors. The debtor freely admitted under oath that his intent was to use the payments to cover debts on other accounts, thereby evincing knowledge that his representations were false. Mr. Fournet obviously relied to his detriment on the debtor's representations. While he thought the suppliers of material were being paid promptly, they were not, with the result that a suit was filed against him as well as the filing of a lien against his home. His reliance on the debtor's representations was reasonable; the common sense interpretation of the terms of the oral contract is that Mr. Fournet's payments would only be used for goods and services provided to him and not to another.

Although this case has been determined by the provisions of section 523(a)(2)(A), it may be helpful to distinguish this decision from that of *In the Matter of Angelle*, 610 F.2d 1335 (5th Cir. 1980). Mr. Angelle, the bankrupt, was engaged in the business of constructing homes. When he filed his petition in bankruptcy, five parties filed objections to the discharge of their claims. Each of the five parties had advanced considerable funds but had been left with only partially completed homes. The parties relied on sections 17a(2), 17a(4), and 17a(8) of the Bankruptcy Act. The cases eventually made their way up to the District Court level. The District Court held the debts nondischargeable on the basis of section 17a(4), finding that Angelle had misappropriated funds while acting in a fiduciary capacity. When the case was appealed to the Fifth Circuit, the sole issue before that court was whether the lower court had correctly determined that Angelle was a fiduciary for the purposes of section 17a(4). The Fifth Circuit determined that Mr. Angelle was not a fiduciary and reversed the District Court. The Fifth Circuit then remanded the case for the purpose of deter-

mining the issues of dischargeability under sections 17a(2) and 17a(8). Since the Fifth Circuit did not consider section 17a(2), the *Angelle* case is not dispositive of the instant case.

In conclusion, we find that the debt in question is excepted from discharge under the provisions of 11 U.S.C. 523(a)(2)(A). Judgment will be rendered in favor of the plaintiff, costs to be paid by the debtor. The judgment will be signed upon submission by counsel for the plaintiff.